AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

### for the
### Southern District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  **21-MJ-1188** |
| **Blue AT&T Cell Phone Seized as FP&F No. 2021565300020001 ("Target Device")** | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8, United States Code § 1324 | Transportation Of Illegal Aliens (a)(1)(A)(ii) |

The application is based on these facts:

See Attached Affidavit of Border Patrol Agent Matthew Kucewicz, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Matthew Kucewicz, Border Patrol Agent, U.S. Border Patrol
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date: ____03/29/2021____

_____
*Judge's signature*

City and state:  San Diego, California

HON. BERNARD G. SKOMAL, U.S. Magistrate Judge
*Printed name and title*

## **AFFIDAVIT**

I, Matthew Kucewicz, being duly sworn, hereby state as follows:

## **INTRODUCTION**

1.     I submit this affidavit in support of an application for warrants to search the following electronic devices:

> Blue AT&T Cell Phone
> Seized as FP&F No. 2021565300020001
> ("Target Device")

the (**"Target Device"**), as further described in Attachment A to seize evidence of crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

2.     The requested warrant(s) relate to the investigation and prosecution of Lomen James WILLARD and Sandy KROTKY for attempting to transport and move illegal aliens within the United States. The **Target Device** is currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

3.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents.  This affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of the investigation into this matter.   Dates and times are approximate.

1

## TRAINING AND EXPERIENCE

4.      I have been employed by the USBP since 2008, and am currently assigned to the San Diego Sector Prosecutions Unit. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for twelve years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5.      My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6.      During my tenure as a Border Patrol Agent, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7.      Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work

in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8.      The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

3

9.      Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data.  In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10.      This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

    a.  tending to indicate efforts to smuggle aliens from Mexico into the United States;

    b.  tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

    c.  tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

    d.  tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

    e.  tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

**FACTS SUPPORTING PROBABLE CAUSE**

11.   On March 26, 2021, Supervisory Border Patrol Agent (SBPA) S. Moran, was conducting assigned duties in the El Cajon Border Patrol Station's area of responsibility (AOR) near Potrero, California.  SBPA Moran was driving a marked Border Patrol vehicle and was wearing plainclothes with the official Border Patrol external body armor carrier with requisite patches, badge, and identification panels. Border Patrol Agents (BPA) B. Hurlbut, R. Arroyo, and J. Bailey were conducting assigned duties in the Brown Field Border Patrol Station's AOR near Dulzura, California.  BPAs Hurlbut and Arroyo were driving unmarked Border Patrol vehicles with fully functioning lights and siren.  BPAs Hurlbut and Arroyo were dressed in plain clothes as well, with their Border Patrol badges displayed around their necks. BPA Bailey was in full rough duty uniform with badges, patches and insignias present and displayed.  BPA Bailey was driving a fully marked Border Patrol vehicle with fully functioning lights and sirens.  Air Interdiction Agent M. Trudgeon was assigned to the Customs and Border Protection, Air and Marine Operations Brown Field Air Unit.  Agent Trudgeon was conducting assigned duties in a Customs and Border Protection helicopter.

12.   SBPA Moran was observing vehicle traffic on California State Route 94 (SR-94) just east of Potrero, CA when an agent asked if there were any units west of an area known as "Canyon City."  SBPA Moran replied in the affirmative and was told to look for a dark sedan or hatchback that left that area at a high rate of speed.  At approximately 6:40 AM, SBPA Moran observed a dark gray BMW with paper plates

5

pass his location at a speed above the posted limit. The driver looked at SBPA Moran, appeared to be gripping the wheel extremely tight, and the vehicle appeared to be weighed down in the back. The back windows appeared dark with heavy condensation. As soon as SBPA Moran pulled into the lane of travel, he observed the BMW begin to accelerate away from his location. SBPA Moran began heading westbound on CA-94 and notified other Agents as well as dispatch. SBPA Moran observed the BMW overtake two different vehicles by passing in the oncoming lane in a double yellow line zone. As SBPA Moran drove west of CA-188, he notified Brown Field Border Patrol Station agents of the situation via service radio. SBPA Moran advised Brown Field agents that the BMW was traveling westbound on CA-94 at a high rate of speed and was overtaking vehicles by passing in double yellow line zones. The vehicle was westbound past the Barret Junction Cafe when Brown Field agents stated they were ready to also observe the BMW.

13.     BPA Arroyo parked at the intersection of SR-94 and Taku Road. At approximately 6:55 AM, BPA Arroyo observed the gray BMW pass his location and relayed that information via service radio. BPA Arroyo was unable to obtain the BMW's license plate due to how quickly the BMW was traveling. BPA Arroyo did observe the driver of the BMW driving recklessly as it passed another vehicle on a curve and not in a designated passing area. BPA Arroyo notified BPA Hurlbut who was further west on SR94.

14.     BPA Hurlbut was parked at the intersection of SR-94 and Lucky Six Truck Trail watching west bound traffic. After hearing BPA Arroyo say the BMW passed his location, BPA Hurlbut observed a gray sedan crest over the hill traveling west at a high rate of speed. As the gray sedan passed his location, BPA Hurlbut saw that it was a gray BMW sedan with paper license plates as described by SBPA Moran. BPA Hurlbut entered into westbound traffic with one other civilian vehicle between his vehicle and the BMW. BPA Hurlbut maintained a visual of the BMW and saw it

pass several other civilian vehicles over a double yellow line and drove dangerously. BPA Hurlbut informed other Agents via service radio of his observations and requested a marked Border Patrol vehicle to perform a vehicle stop. SBPA J. Hilsenroth informed Agents via service radio that the SR-94 Border Patrol Checkpoint was being opened to help stop and inspect traffic. The BMW continued heading west toward the SR-94 Checkpoint.

15.    BPA Hurlbut continued to follow the BMW and gave updates via service radio of its driving behavior and location as it passed various landmarks. Upon approaching the SR-94 Checkpoint and just before the position of the cones directing westbound traffic into the inspection area, the BMW stopped and made a U-turn in the middle of SR-94 and started to travel east. BPA Hurlbut, along with BPAs Arroyo, Bailey and SBPA Moran all activated their emergency lights and siren. The BMW accelerated at a high rate of speed and began traveling east on SR-94. As the BMW passed BPA Hurlbut, he observed a male driver with long hair and a mustache, a female front seat passenger and several individuals in the back seat area. BPA Hurlbut observed the female front seat passenger flailing and rapidly motioning both arms forward as it she was motioning to go fast or accelerate.

16.    SBPA Moran became the primary pursuit vehicle behind the BMW with BPA Bailey as the secondary pursuit vehicle. SBPA Hilsenroth authorized the pursuit of the BMW and an attempt to deploy the controlled tire deflation device when practicable. As the pursuit continued east on SR-94, Air Interdiction Agent Trudgeon overheard the pursuit on his radio. Agent Trudgeon responded to the area to locate the absconding vehicle. Agent Trudgeon observed a grey BMW sedan that appeared to be traveling at a high rate of speed eastbound on SR-94 and confirmed with agents on the ground that he was looking at the correct vehicle. Agent Trudgeon saw the grey BMW exit SR-94 onto Marron Valley road. Approximately 75 yards down Marron Valley road, the grey BMW sedan stopped, then three individuals in dark clothing

exited the rear driver and passenger doors of the vehicle and ran into the yard of a house on the east side of Marron Valley road. Agent Trudgeon maintained visual observation of the area the individuals had run to, then observed the grey BMW sedan continue south on Marron Valley road at a high rate of speed.

17.     Agent Trudgeon reported this to the pursuit agents and hovered over the three subjects while he directed the approaching ground agents to their hiding location. BPA Bailey exited his vehicle and Agent Trudgeon guided him to the approximate location where the individuals were hiding. BPA Bailey observed the three individuals trying to conceal themselves in the thick brush. BPA Bailey identified himself as a Border Patrol Agent and conducted an immigration inspection. Each individual, later identified as Material Witnesses Lorena CASTRO-Hernandez, Rafael GARCIA-Gutierrez, and Jose Ruperto RAMIREZ-Gonzalez, stated they were citizens of Mexico and did not possess any documents that would allow them to enter or remain in the United States legally. At approximately 7:13 AM, BPA Bailey placed all three individuals under arrest.

18.     After the BMW dropped off the three individuals, SBPA Moran continued to pursue the BMW as it went south on Marron Valley Road. BPAs Arroyo and Hurlbut followed behind. Agent Trudgeon advised via service radio that the BMW had gotten stuck behind some slower vehicles as it was approaching the South Bay Rod and Gun Club, which slowed its progress.

19.     The BMW entered the South Bay Rod and Gun Club property and continued traveling until it entered a gun range and ran out of roadway. The BMW made a U-turn but was quickly confronted by SBPA Moran and BPAs Arroyo and Hurlbut. A felony stop was conducted on the driver and passenger, as both were ordered out of the vehicle at gunpoint.

20.     The front seat passenger, later identified as defendant Sandy KROTKY, exited the BMW and began yelling at the Agents. BPA Hurlbut ordered both

8

1  KROTKY and the driver, later identified as defendant Lomen James WILLARD, to

2  get on the ground and place their hands behind their back.  It took multiple commands
   to do so, but WILLARD complied, and BPA Arroyo placed him in handcuffs.

3  KROTKY resisted the Agents commands after struggling with the Agents was placed

4  in handcuffs by SBPA Moran and BPA Hurlbut.

5          21.     During the detention of WILLARD and KROTKY, Agents overheard on
   the radio that the three individuals who had ran from the BMW had been apprehended

6  by BPA Bailey and they had admitted to being undocumented aliens.  BPA Arroyo

7  then placed WILLARD and KROTKY under arrest at approximately 7:25 AM.

8          22.     During an inventory search of the vehicle a Blue AT&T Cell Phone
   (**Target Device**), was discovered between the driver's seat and center console.

9  WILLARD later claimed ownership of the Blue AT&T Cell Phone (**Target Device**).

10         23.     Defendant, Sandy KROTKY, was read her Miranda Rights.  KROTKY
   stated that she understood her rights and was willing to provide a statement.

11 KROTKY was asked about the methamphetamine that was found in her purse.

12 KROTKY stated that the methamphetamine was hers, and it was given to her for free

13 by an individual she was not willing to name.  KROTKY described her purse as a pink
   purse, the same pink purse the methamphetamine was found in.  KROTKY was asked

14 to describe the events that led to her arrest on March 26, 2021.  KROTKY stated her

15 friend "LOMEN" liked her newly purchased BMW 328i and asked if he could drive it

16 on the way to the Jamul Casino, where they both planned on gambling.  KROTKY
   stated that both her and LOMEN won some money at the casino.  KROTKY stated

17 shortly after leaving the Jamul Casino, she fell asleep.  KROTKY stated she woke up

18 when LOMEN made an aggressive U-turn at the State Route 94 Border Patrol

19 Checkpoint in Jamul, California.  When asked if KROTKY knew the checkpoint was

20 an immigration checkpoint, she stated she did and had previously passed through the
   checkpoint.  KROTKY was asked if she thought it was weird LOMEN made an illegal

21

U-turn right before the checkpoint, and she stated, "Yeah." KROTKY stated LOMEN began driving aggressively and she knew law enforcement was behind them with their lights and sirens on. KROTKY stated that LOMEN pulled over and suddenly, Border Patrol arrived and took both her and LOMEN into custody.

24.     Material witnesses CASTRO, GARCIA, and RAMIREZ admitted to being citizens of Mexico, illegally present in the United States, and not having any documents that would allow them to enter or remain in the United States legally. CASTRO, GARCIA, and RAMIREZ admitted to making smuggling arrangements had agreed to pay between $7,000.00 and $9,000.00 USD. RAMIREZ stated he illegally crossed the border along with two other individuals. RAMIREZ stated he was guided through the mountains by using a two-way radio. RAMIREZ stated he was instructed to get to State Route 94 (SR-94) and throw the radio away once the vehicle picked them up. RAMIREZ stated he was instructed to come down from the mountain and get in a vehicle parked on the side of the road. RAMIREZ stated the vehicle had the back-passenger door opened and that's how the three of them got inside the vehicle. CASTRO stated when the vehicle arrived someone from inside the vehicle yelled "Laura." GARCIA stated when the load vehicle arrived at the load up location someone from inside the vehicle yelled "Lupe" which he thinks is the name of the female that was traveling with them. CASTRO, GARCIA, and RAMIREZ stated once inside the vehicle they noticed two individuals, the driver was a male and the passenger was a female. GARCIA stated the female front passenger told them in the Spanish language, "Get down and don't lift your head." CASTRO stated once inside the vehicle the female passenger told them in the Spanish language, "Get down, as low as you can." CASTRO, GARCIA, and RAMIREZ stated once inside the vehicle the driver began driving at a high rate of speed on State Route-94. RAMIREZ stated he noticed a Border Patrol vehicle behind them, and the driver and passenger started arguing. CASTRO, GARCIA, and RAMIREZ stated when they approached

the State Route-94 Border Patrol checkpoint the driver made a U-turn and began driving away from the checkpoint. CASTRO, GARCIA, and RAMIREZ stated a few minutes later they noticed Border Patrol vehicles pursuing them with lights and sirens on. CASTRO, GARCIA, and RAMIREZ stated the driver was driving at a high rate of speed and passing many vehicles along the way. CASTRO, GARCIA, and RAMIREZ stated they became very close to crashing with another vehicle on the road. CASTRO, GARCIA, and RAMIREZ stated they feared for their life while traveling in the vehicle. CASTRO, GARCIA, and RAMIREZ stated when the vehicle came to a stop, the female front passenger told them get out of the vehicle. RAMIREZ stated they got out of the vehicle and a few minutes later they were placed under arrest by Border Patrol Agents. RAMIREZ stated the vehicle continued driving and he did not notice where they went. CASTRO, GARCIA, and RAMIREZ were unable to identify the defendants, KROTKY and WILLARD

25.     Based upon my experience and training, consultation with other law enforcement officers experienced in human trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Device**. In light of the above facts and my experience and training, there is probable cause to believe that the Defendant was using the **Target Device** to communicate with others to further illegal entry into the United States. Based on my training and experience, it is also not unusual for individuals, such as the Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Device** for data beginning on February 26, 2021 through March 26, 2021.

## METHODOLOGY

26.     It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

27.     Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

28.    Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

29.    Law enforcement has previously attempted to obtain the evidence sought by this warrant through the owners' consent.  Consent was not given.

## CONCLUSION

30.    Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Device** will yield evidence of alien smuggling violation of Title 8, United States Code, Sections 1324.

31.    Because the **Target Device** was seized at the time of WILLARD's arrest and has been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Device**. As stated above, I believe that the appropriate date range for this search is from **February 26, 2021 through March 26, 2021.**

32.    Accordingly, I request that the Court issue warrants authorizing law enforcement to search the item(s) described in Attachment(s) A, and seize the items listed in Attachment B using the above-described methodology.

13

1

I swear the foregoing is true and correct to the best of my knowledge and belief.

2

3

4

Matthew Kucewicz
Border Patrol Agent

5

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P.

6

4.1 by telephone on this 29th day of March, 2021.

7

8

HON. BERNARD G. SKOMAL
United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

14

1

## **ATTACHMENT A**

2
PROPERTY TO BE SEARCHED

3 The following property is to be searched:

4 Blue AT&T Cell Phone
Seized as FP&F No. 2021565300020001
5 ("Target Device")

6 Target Device is currently in the custody of the Department of Homeland Security,
Customs and Border Protection, United States Border Patrol, San Diego Sector.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

## **ATTACHMENT B**

ITEMS TO BE SEIZED

Authorization to search the cellular telephones described in Attachment A, and includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones for evidence described below.  The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrants.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **February 26, 2021 through March 26, 2021**:

a.   tending to indicate efforts to smuggle aliens from Mexico into the United States;

b.   tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c.   tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d.   tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e.   tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 8, United States Code, Section 1324.